Jeffrey D. Eisenberg (4029)
Ryan M. Springer (9942)
**EISENBERG LOWRANCE LUNDELL LOFGREN**
1099 W. South Jordan Parkway
South Jordan, Utah 84095
Telephone: (801) 464-6464
Facsimile: (801) 254-0303
Email: jeisenberg@3law.com
        rspringer@3law.com
*Attorneys for Plaintiffs*

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF UTAH

| | |
|---|---|
| SUSAN RICHARDS, RAY RICHARDS, JIMMY RICHARDS, PAULA RICHARDS KRISTENSEN, JARED RICHARDS, and KIMBERLY RICHARDS, Individually and on Behalf of the Heirs and Estate of JAMES E. RICHARDS,<br><br>    Plaintiffs,<br><br>vs.<br><br>BEAVER CITY; BEAVER VALLEY HOSPITAL; OLYMPUS HEALTH, INC. *dba* HOLLADAY HEALTHCARE CENTER; MARY JEAN WALKER, APRN; ENSIGN HEALTHCARE, INC.; ENSIGN SERVICES, INC.; THE ENSIGN GROUP, INC.; MATTHEW CHURCH, and DOES I-X,<br><br>    Defendants. | **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS BEAVER CITY AND BEAVER VALLEY HOSPITAL'S RULE 12(b)(6) MOTION TO DISMISS**<br><br><br>Case No. 2:25-cv-00237-DAK-JCB<br><br>Judge Dale A. Kimball<br><br>Magistrate Judge Jared C. Bennett |

Plaintiffs, Susan Richards, Ray Richards, Jimmy Richards, Paula Richards Kristensen,

Jared Richards, and Kimberly Richards, individually and on behalf of the heirs and the Estate of

James E. Richards, by and through undersigned counsel, submit this Memorandum in Opposition

to the Rule 12(b)(6) Motion to Dismiss filed by Defendants Beaver City and Beaver Valley Hospital. The motion should be denied because Plaintiffs have stated claims for relief under 42 U.S.C. § 1983 based on violations of rights secured by the Federal Nursing Home Reform Act (FNHRA). The Supreme Court's decision in *Health & Hospital Corp. of Marion County v. Talevski*, 599 U.S. 166, 143 S. Ct. 1444 (2023), confirms that such claims are actionable. Plaintiffs have also adequately alleged municipal liability under *Monell v. Department of Social Services*, 436 U.S. 658 (1978). Additional reasoning and authority are set forth more fully herein.

## **INTRODUCTION**

This case arises from the wrongful death of James Richards, a U.S. Veteran and Medicaid recipient who was sent to Holladay Healthcare Center ("HHC") for rehabilitation following surgery. HHC is a skilled nursing facility owned and operated under the authority of Beaver City and licensed to its municipal hospital, Beaver Valley Hospital. Plaintiffs allege that Mr. Richards died as a direct result of unconstitutional policies, customs, and deliberate indifference to federally protected rights guaranteed under the Federal Nursing Home Reform Act ("FNHRA"), 42 U.S.C. § 1396r, which are enforceable through 42 U.S.C. § 1983. Specifically, Plaintiffs allege that Beaver City, acting through its final policymaker, the Beaver City Hospital Board, engaged in deliberate budgetary decisions and participated in an Upper Payment Limit ("UPL") monetary diversion scheme that led to inadequate staffing and improper care, thereby knowingly and foreseeably depriving Mr. Richards and other nursing home residents of their statutory and constitutional rights.[1]

---

[1] Utah's UPL program operates under 42 C.F.R. § 447.272(b)(1) (requiring state plans to include "supplemental payments to participating [non-state governmental] nursing facilities" up to the federal upper payment limit), Utah Medicaid State Plan, Attachment 4.19-D, § 900 (approved Feb. 2, 2013, authorizing IGT-seeded supplemental payments to NSGOs), and Utah Admin. Code R414-10-2(58) (defining "non-state government owned nursing

Beaver City and its affiliated hospital (the "Beaver Defendants") now move to dismiss Plaintiffs' § 1983 claim under Rule 12(b)(6), arguing that Plaintiffs have failed to allege a constitutional violation, that no unconstitutional policy is identified, and that municipal liability cannot attach to the actions of the nursing home's staff. Each of these contentions is legally and factually incorrect and does not warrant relief under Rule 12(b)(6). Plaintiffs' Complaint sets forth detailed, well-pleaded allegations establishing that Beaver City created and empowered a hospital board under municipal ordinance with final policymaking authority over clinical staffing, financial allocations, and operations of multiple nursing homes throughout Utah, including Holladay Health Care. The Complaint further alleges that this Board knowingly diverted Medicaid funds away from patient care, adopted policies maintaining dangerously low staffing levels, and ignored federal requirements intended to protect nursing home residents like Mr. Richards, thereby demonstrating deliberate indifference to his rights and safety.

---

facility"). Under these authorities, only a non-state governmental owner or operator (such as Beaver City Hospital) may effect the intergovernmental transfer of public funds that "seed" the UPL pool and thereby draw federal matching dollars, which, pursuant to Utah Code Ann. § 26-18-2(1)(c), the State then distributes, together with state match, to the operating facility and its private equity manager—in this case, Ensign, Inc. *See generally* Office of the Legislative Auditor General, State of Utah, *A Performance Audit of the Beaver Valley Hospital's Medicaid Upper Payment Limit Program*, Report No. 2017-10 (Oct. 2017), https://le.utah.gov/interim/2017/pdf/00004449.pdf.

Therefore, under Utah's Medicaid Supplemental Payment Program, nursing facilities may receive "upper payment limit" (UPL) reimbursements only if a non-state governmental owner or operator makes an intergovernmental transfer (IGT) of public funds to the state. Utah's State Plan caps total Medicaid reimbursement for services at the federal upper payment limit, and to claim the difference between that cap and actual Medicaid rates, facilities must participate in an IGT. Because privately owned managers such as Olympus Health, Inc. lack governmental authority, they cannot seed the required transfer themselves. Instead, Beaver City, in its capacity as a locally owned hospital authority, must originate the public transfer that "seeds" the UPL pool; the state uses that transfer to draw down federal matching funds, after which Beaver City redirects the combined state-federal payments to the facility operator and its contractor. Thus, without Beaver City's involvement in the IGT process, neither the private management companies nor the nursing home operator could capture the additional UPL revenues that finance both resident care and the private entities' management fees. *See generally* Ashvin Gandhi & Andrew Olenski, *Tunneling and Hidden Profits in Health Care,* NBER Working Paper No. 32258 (Mar. 2024, revised Sept. 2024), https://www.nber.org/papers/w32258 and Himanshu Sharma & Lili Xu, *Use of Intergovernmental Transfers-Based Medicaid Supplemental Payments to Boost Nursing Home Finances: Evidence from Indiana Nursing Homes*, 61 Med. Care 546 (2023), https://pmc.ncbi.nlm.nih.gov/articles/PMC10330393/pdf/nihms-1901396.pdf.

This memorandum opposes the motion to dismiss on the following grounds:

(1) Plaintiffs' allegations plausibly state violations of clearly established FNHRA rights enforceable under § 1983, including the rights to adequate staffing, quality of care, and informed participation in care planning;

(2) Beaver City, through its Hospital Board, qualifies as a final policymaker under well-settled *Monell* doctrine, and the challenged actions and omissions are fairly attributable to the municipality;

(3) The deliberate policy decisions regarding UPL fund allocation, staffing freezes, and related-party financial transactions were the moving force behind the deprivation of care;

(4) Plaintiffs' Complaint contains detailed allegations demonstrating deliberate indifference, actual knowledge of risk, and conscious disregard sufficient to meet the pleading standard under *Iqbal* and *Twombly*; and

(5) Because the Complaint pleads a plausible and compelling claim for relief under § 1983, the motion to dismiss should be denied in its entirety.

## ARGUMENT

### I. LEGAL STANDARDS.

#### A.  Standard for Rule 12(b)(6) Motion to Dismiss.

A Rule 12(b)(6) motion to dismiss tests the legal sufficiency of a complaint, not the merits of the underlying claims. To survive such a motion, a complaint must contain "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). Under the plausibility standard established in *Twombly* and refined in *Ashcroft v. Iqbal*, 556 U.S. 662 (2009), the Court must accept all well-pleaded factual allegations as true and draw

all reasonable inferences in Plaintiff's favor. *Ridge at Red Hawk, L.L.C. v. Schneider*, 493 F.3d 1174, 1177 (10th Cir. 2007).

All that is required is "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). The complaint must, however, contain "enough facts to state a claim to relief that is plausible on its face" and "raise a right to relief about the speculative level." *Twombly*, 550 U.S. at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *S.E.C. v. Shields*, 744 F.3d 633, 640 (10th Cir. 2014) (*quoting Iqbal*, 556 U.S. at 678).

The plausibility standard requires "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Twombly*, 550 U.S. at 555. However, the standard does not impose any kind of heightened pleading requirement. *See Currier v. Doran*, 242 F.3d 905, 914 (citing *Leatherman v. Tarrant County Narcotics Intelligence & Coordination Unit*, 507 U.S. 163, 168 (1993)). Rather, the complaint must contain "factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. Courts must "draw on [their] judicial experience and common sense" in determining whether the allegations cross the threshold from possibility to plausibility. *Id.* at 679.

Importantly, when considering a motion to dismiss, courts "take all of the factual allegations in the complaint as true" and "view them in the light most favorable to the plaintiff." *Ridge at Red Hawk*, 493 F.3d at 1177. The Court may not dismiss a complaint unless "it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which

would entitle him to relief." *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957).

**B. Section 1983 Claims Against Municipal Defendants.**

Section 1983 provides a cause of action against any person who, "under color of any statute, ordinance, regulation, custom, or usage, of any State," subjects another "to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws." 42 U.S.C. § 1983. Municipal liability under Section 1983 is governed by *Monell v. Department of Social Services*, 436 U.S. 658 (1978).

To establish municipal liability under *Monell*, a plaintiff must demonstrate: (1) that a municipal employee committed a constitutional violation; and (2) that a municipal policy or custom was the moving force behind, or the direct causal link to, the constitutional deprivation. *Dodds v. Richardson*, 614 F.3d 1185, 1202 (10th Cir. 2010). Municipal policies can be established through: (1) a formal regulation or policy statement; (2) an informal custom amounting to a widespread practice that is so permanent and well-settled as to constitute a custom or usage with the force of law; (3) the decisions of employees with final policymaking authority; or (4) the ratification by such final policymakers of the decisions of subordinates. *Bryson v. City of Edmond*, 905 F.3d 787, 797-98 (10th Cir. 2018).

**C. Federal Nursing Home Reform Act Enforcement Under Section 1983.**

The Supreme Court's recent decision in *Health & Hospital Corp. of Marion County v. Talevski*, 599 U.S. 166, 143 S. Ct. 1444 (2023), definitively established that certain provisions of the Federal Nursing Home Reform Act create individually enforceable rights under Section 1983. The Court held that certain provisions of FNHRA unambiguously confer individual rights and are presumptively enforceable under Section 1983, with no incompatibility between private

6

enforcement and the Act's administrative remedial scheme. *Id.* at 1456-58.

Under *Talevski*, federal statutes can create § 1983-enforceable rights when they: (1) unambiguously confer individual rights using "rights-creating, individual-centric language with an unmistakable focus on the benefited class;" and (2) are not foreclosed by an incompatible remedial scheme that Congress intended to be exclusive. *Id.* at 1456. FNHRA provisions that speak "in terms of the persons benefited" and contain "rights-creating language" meet this standard. *Id.*

### D. Due Process Claims Under the Fourteenth Amendment.

Substantive due process protects individuals against government action that is either arbitrary or conscience-shocking. *County of Sacramento v. Lewis*, 523 U.S. 833, 846 (1998). In the context of state-operated facilities, deliberate indifference to known serious risks can violate substantive due process when the state has assumed a special relationship or custody over the individual. *DeShaney v. Winnebago County Dep't of Social Servs.*, 489 U.S. 189, 200 (1989).

## II. FNHRA RIGHTS ARE ENFORCEABLE UNDER 42 U.S.C. § 1983 FOLLOWING *TALEVSKI*.

In *Health & Hospital Corp. of Marion County v. Talevski*, 599 U.S. 166 (2023), the United States Supreme Court held unequivocally that the Federal Nursing Home Reform Act (FNHRA), 42 U.S.C. § 1396r, creates individual rights enforceable under 42 U.S.C. § 1983. Rejecting the argument that Spending Clause statutes are categorically excluded from § 1983 enforcement, the Court concluded that FNHRA's provisions meet the three-prong test set forth in *Blessing v. Freestone*, 520 U.S. 329 (1997), and reaffirmed in *Gonzaga Univ. v. Doe*, 536 U.S. 273 (2002): (1) the statute confers specific, individually enforceable rights; (2) the rights are not so vague or amorphous as to defy judicial enforcement; and (3) the statutory scheme does not preclude private

enforcement. See *Talevski*, 599 U.S. at 179–82.

FNHRA states that "[a] nursing facility must protect and promote the rights of each resident..." 42 U.S.C. § 1396r(c)(1)(A). The statute includes a wide range of enforceable entitlements, including the rights to receive adequate and appropriate care, to be fully informed of one's medical condition and care plans, to participate in decision-making, and to receive individualized attention consistent with professional standards.

Plaintiffs have pleaded specific violations of these rights. The Complaint alleges that Mr. Richards was denied necessary services due to chronic understaffing, was not properly informed of his condition or included in care planning, and was ultimately subjected to dangerous neglect.[2] These are precisely the kinds of statutory violations the Supreme Court held actionable in *Talevski*. Plaintiffs' FNHRA-based claims against municipal actors, including Beaver City and Beaver Valley Hospital, fall squarely within the scope of claims permitted under § 1983.

In *Talevski*, the U.S. Supreme Court specifically held that individuals may sue state actors under 42 U.S.C. § 1983 to enforce certain rights created by federal statutes, including FNHRA. The case arose after Gorgi Talevski, a dementia patient living in an Indiana county-operated nursing home, was subjected to unauthorized chemical restraints and was nearly transferred involuntarily to a remote facility without notice. Following his death, his wife brought a § 1983 action on his behalf, alleging violations of two provisions of FNHRA. In the district court, the defendants, including the county health system, successfully moved to dismiss, arguing that

---

[2] *See* Compl. at ¶ 1 (alleging violations of the resident's right to reside and receive services with reasonable accommodation of individual needs and preferences (42 U.S.C. § 1396r(c)(1)(A)(v)(i)); and the right to be informed of changes in their condition or treatment and the right to participate in planning their care (42 U.S.C § 1396r(c)(1)(A)(i))).

Spending Clause statutes like FNHRA could not be privately enforced through § 1983, and that Congress had implicitly precluded such actions. The plaintiffs appealed the dismissal and the Seventh Circuit reversed, holding that FNHRA conferred rights enforceable under § 1983. *See Talevski v. Health & Hospital Corp. of Marion County*, 6 F.4th 713 (7th Cir. 2021).

Pursuant to the FNHRA, "[a] nursing facility must protect and promote the rights of each resident." 42 U.S.C. § 1396r(c)(1)(A). As in *Talevski*, the Complaint alleges that the Beaver Defendants violated Mr. Richards' enforceable rights under FNHRA—namely, the right to reside and receive services with reasonable accommodations for individual needs and preferences; the right to be informed of changes in his condition or treatment; and the right to participate in care planning.[3] Each of these rights, according to the Supreme Court, is enforceable through § 1983. *See Talevski* at 172–73.

In this case, the Complaint alleges that these rights were violated and set in motion by the Beaver Valley Hospital Board. By law, the Board exercises final policymaking authority over budgetary and operational decisions at the skilled nursing facility. The Board, through its budget resolutions, enacted staffing ratios well below recommended standards (*e.g.*, the CMS benchmark of 4.1 Hours Per Patient Day "HPPD"). These allegations, taken as true, are sufficient to state claims for violations of (1) the enforceable right to sufficient licensed nursing services to meet the nursing needs of residents (42 U.S.C. § 1396r(b)(4)(C)(i)); (2) the enforceable right to receive services that meet professional standards of quality and ensure the highest practicable well-being (42 U.S.C. § 1396r(b)(1)(A)); and (3) the enforceable right to participate in and be fully informed about treatment and care planning (42 U.S.C. § 1396r(c)(1)(A)).

---

[3] *See* Comp. at ¶ 1(a) and (b) (citing 42 U.S.C. § 1396r(c)(1)(A)(v)(i) and 42 U.S.C. § 1396r(c)(1)(A)(i).

### III. PLAINTIFFS HAVE PLAUSIBLY ALLEGED MUNICIPAL LIABILITY UNDER *MONELL.*

#### A.  The Beaver City Hospital Board Acted as a Final Policymaker.

Beaver City's motion to dismiss Plaintiffs' § 1983 claim fails because it ignores well-pleaded allegations that Beaver City, acting through the Beaver Valley Hospital Board (a municipal body created by ordinance) exercised final policymaking authority over the very policies that resulted in the deprivation of Mr. Richards's federally protected rights. Under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), a municipality can be liable under § 1983 where an alleged constitutional or statutory deprivation arises from a policy or custom enacted or ratified by a final policymaker. The Complaint more than satisfies that standard.

The Complaint alleges that Beaver City created the Beaver Valley Hospital Board by ordinance pursuant to Utah Code Ann. § 10-8-90 and delegated to it final policymaking authority over operations, budgeting, staffing, and compliance at Holladay Healthcare Center. This satisfies the requirement under *Monell v. Department of Social Services*, 436 U.S. 658 (1978), that the deprivation stem from a policy, practice, or decision of a municipal entity or its final policymaker.

The Tenth Circuit has repeatedly affirmed that municipalities may be held liable under § 1983 for the actions of final policymakers, even when their conduct deviates from written policy. In *Simmons v. Uintah Health Care Special Serv. Dist.*, 506 F.3d 1281 (10th Cir. 2007), the court held that the governing board's one-time decision to terminate an employee in violation of internal procedures was sufficient to create municipal liability. Similarly, in *Whitson v. Sedgwick County*, 106 F.4th 1063 (10th Cir. 2024), the court emphasized that "[t]he motive of the policymaker is irrelevant," and that actions taken under formal authority—even when unlawful—can trigger *Monell* liability. *Id.* at 1071–72.

As alleged in Paragraph 44 and footnote 1 of the Complaint, Beaver City enacted an ordinance pursuant to Utah Code Ann. § 10-8-90 creating a seven-member hospital board "for the purpose of supervision, administration, and management of the Beaver City Hospital." The resulting body—the Beaver Valley Hospital Board—holds the license for Holladay Healthcare Center and, as such, exercises broad regulatory and operational authority over its activities. Under Tenth Circuit precedent, this legislative delegation of governance authority is sufficient to plead final policymaking status. *See Whitson*, 106 F.4th at 1072 (final policymaking exists where statute or ordinance delegates exclusive control over relevant operations); *see also Simmons*, 506 F.3d at 1285–86.

In *Simmons*, the Tenth Circuit reversed dismissal of a § 1983 claim brought against a county-run nursing facility, holding that even a single decision by a governing board—there, to terminate an administrator in violation of its own policies—could constitute municipal policy when made by a final decisionmaker. The court rejected the notion that municipal liability turns solely on conformity with written policy, holding instead that "a decision by an official with final policymaking authority in a particular area gives rise to municipal liability, even if that decision is a one-time event." *Id.* at 1287. The same principle applies here: Plaintiffs challenge deliberate, board-level decisions on staffing, budgeting, and care delivery—areas squarely within the board's delegated authority.

Likewise, *Whitson* reaffirms that a municipality may be held liable under § 1983 where the challenged conduct stems from a final policymaker acting within the scope of their delegated authority, even if the conduct violates formal policy. In *Whitson*, the Tenth Circuit concluded that a county could be held liable for a sexual assault committed by its sheriff during detainee transport,

emphasizing that "[t]he motive of the policymaker is irrelevant" and that "[a] single decision by a final policymaker may result in municipal liability." *Whitson*, 106 F.4th at 1071–72. The court expressly rejected arguments that operational delegation or internal policy disclaimers shield municipalities from liability, underscoring that formal legal authority—not day-to-day operational control—is dispositive under *Monell*.

Plaintiffs' allegations are directly analogous. The Complaint pleads that the Hospital Board maintained responsibility for core governance functions, including staffing decisions, budget allocations, and control over Medicaid UPL reimbursements—functions that go to the heart of care quality at Holladay Health Care.[4] Plaintiffs further allege that the Board froze staffing levels, failed to implement corrective policies in response to regulatory violations, and approved financial transfers that diverted funds away from direct patient care. These decisions were not isolated operational errors, but deliberate, board-level decisions and omissions that give rise to *Monell* liability against Beaver City.

Importantly, the Complaint alleges that Beaver City and its Hospital Board exercised their authority "under color of state law" and were responsible for "policies, practices, and procedures" governing resident care at Holladay Healthcare Center. *See* Compl. ¶¶ 17, 41–44. These allegations provide a clear link between the actions of final municipal policymakers and the deprivation of federally protected rights, including those enforceable under FNHRA pursuant to *Talevski*. *Whitson* and *Simmons* affirm that formal delegation of authority, not conformity with internal procedures or involvement in day-to-day operations, controls the *Monell* analysis.

Defendants' claim that the Complaint fails to identify "who did what" misses the mark.

---

[4] *See* Compl. ¶¶ 10, 11, 20, 45–46.

Plaintiffs clearly allege that Beaver City's Hospital Board was the municipal policymaker, with delegated authority over staffing, budgeting, and care standards. They further allege that the Board's affirmative decisions and knowing omissions caused the constitutional and statutory injuries suffered by Mr. Richards. These are precisely the kinds of factual allegations the Tenth Circuit has held sufficient to support municipal liability and to survive a Rule 12(b)(6) motion.

The Southern District of Indiana recently addressed a similar case involving a municipally owned nursing home, operated by private equity partners. In *Tester v. Village at Hamilton Point*, No. 1:23-cv-01234, 2024 WL 941918 (S.D. Ind. Mar. 6, 2024), the court applied *Talevski* and denied a Rule 12(b)(6) motion challenging the sufficiency of Monell allegations. There, the court held that "[t]he pleading threshold does not require a plaintiff to identify the specific decision-maker or name a written policy where the complaint plausibly alleges a widespread practice or pattern of indifference." *Tester*, 2024 WL 941918, at *6.

In *Tester*, the plaintiff brought a § 1983 action on behalf of her deceased mother, a former nursing home resident, alleging that the municipal defendant (an Indiana hospital district) violated the decedent's rights under the Federal Nursing Home Reform Act (FNHRA), 42 U.S.C. § 1396r, by failing to ensure adequate care in a facility it owned but contracted out to a private operator. The complaint alleged that the municipality maintained policies and financial arrangements that incentivized underfunding, led to chronic understaffing, and failed to address persistent signs of substandard care, including untreated infections, repeated falls, and ultimately, the resident's death. The defendant moved to dismiss, arguing that it had no direct involvement in day-to-day care and that FNHRA does not confer enforceable rights through § 1983.

The Southern District of Indiana denied the motion to dismiss, holding that *Talevski*

conclusively established that FNHRA confers rights enforceable under § 1983. The court also found that the plaintiff plausibly alleged a municipal policy or custom—based on contractual arrangements and the municipality's failure to intervene—that, if proven, could support *Monell* liability. Specifically, the *Tester* court held that allegations of chronic understaffing, cost-saving at the expense of resident care, and insufficient training or supervision were sufficient to plead a municipal custom or policy under *Monell*. *Id*. at *5–6. At the pleading stage, the court explained, a plaintiff need not identify specific municipal actors or provide discovery-level detail about who signed or approved the third-party management contract. *Id*. at *6.

As in *Tester*, dismissal of the Richards' case under Rule 12(b)(6) would be inappropriate. At a minimum, the Complaint's allegations are sufficient to proceed to discovery, where the full contours of Beaver City and its Hospital Board's involvement and role in resource allocation and staffing levels at HHC can be explored.

Plaintiffs' complaint more than satisfies the pleading standards required to survive a Rule 12(b)(6) motion under *Talevski*. When viewed in the light most favorable to Plaintiffs, the allegations plausibly state a claim under 42 U.S.C. § 1983 for violations of rights guaranteed by the Federal Nursing Home Reform Act (FNHRA), 42 U.S.C. § 1396r, and the Fourteenth Amendment. These allegations, if proven, establish that Beaver City and Beaver Valley Hospital engaged in conduct that supports municipal liability under *Monell*.

### B.  Plaintiffs' Complaint Alleges a Policy, Custom, or Practice that Caused the Harm.

Plaintiffs specifically allege that Beaver City and Beaver Valley Hospital jointly held the license to operate Holladay Healthcare Center and entered into management agreements and

reimbursement arrangements (including those involving the Upper Payment Limit [UPL] program) that prioritized financial benefit over resident care. The complaint details how Defendants, acting through or in concert with Olympus Health, Inc., maintained a practice of chronic understaffing, failed to invest in training or oversight systems, and ratified care policies that predictably led to substandard treatment and resident harm.

Between 2020 and 2023, the Beaver City Hospital Board, acting under municipal ordinance and empowered as the final policymaker for Beaver Valley Hospital[5] and its network of nursing homes—including Holladay Healthcare Center—implemented a series of financial and administrative policies designed to maximize institutional revenue through Utah's UPL Medicaid program. Although the UPL program was designed to enhance care for vulnerable, low-income patients by providing supplemental Medicaid reimbursements, the Board adopted a diversion structure that systematically redirected UPL funds away from clinical care and into nonclinical administrative channels. An audit by Utah's Legislative Auditor General found that "over half of [the UPL funds were] sent to [Beaver Valley Hospital] for administrative funding and seeding for future UPL funding."[6] This amount does not include any funds that have been "tunneled" to related companies.[7]

---

[5] *See* Compl. at ¶ 43 n.1. Section 2.1 of the Beaver City Municipal Code enacts "The Beaver City, Utah, Hospital Ordinance." The ordinance recognizes a previously constructed Beaver City Hospital, which is "owned and operated as provided by the provisions of Utah Code Annotated section 10-8-90." Section 2.1.3 of the ordinance creates a seven-member "Beaver City Hospital Board, consisting of seven (7) members, one of whom shall be the Mayor and six (6) of whom shall be appointed for the purpose of supervision, administration and management of the Beaver City Hospital."

[6] Utah Office of Legislative Auditor General, *A Performance Audit of Beaver Valley Hospital's Medicaid Upper Payment Limit Program*, Rep. No. 2017-10 (Oct. 2017), https://le.utah.gov/interim/2017/pdf/00004449.pdf.

[7] Ashvin Gandhi & Andrew Olenski, *Tunneling and Hidden Profits in Health Care*, NBER Working Paper No. 32258 (Mar. 2024), https://www.nber.org/papers/w32258.

Despite receiving millions in federal supplemental Medicaid funds, the Board repeatedly voted to freeze direct care staffing budgets at dangerously low levels well below both federal compliance thresholds and evidence-based standards of adequate care. The facility's staffing levels—approximately 2.65 hours per patient per day (HPPD)[8]—fell significantly short of the 4.1 HPPD recommended by CMS[9] and ignored clinical warnings from facility-level administrators about rising safety risks and growing staff burnout.

James Richards was a Medicaid beneficiary and resident of Holladay Healthcare Center during this period.[10] As a frail, elderly man with multiple chronic conditions, he relied on nursing staff not only for basic care but also for clinical oversight of his nutrition, hydration, and functional status.[11] However, due to the Board's budgetary policy, HHC was persistently understaffed.[12] Certified nursing assistants were responsible for more patients than they could safely monitor, and staff were frequently rushed—unable to document changes in condition, communicate care plans, or respond to emerging risks.[13] As a result, no one adequately tracked Mr. Richards' food intake, weight loss, or visible signs of clinical deterioration.[14]

---

[8] This number is found by averaging the staffing numbers in the Payment Based Journal data submitted to CMS for the second quarter of 2023, available at data.cms.gov.

[9] Centers for Medicare & Medicaid Services, *Appropriateness of Minimum Nurse Staffing Ratios in Nursing Homes, Report to Congress: Phase II Final* (Dec. 2001).

[10] *See* Compl. ¶¶ 9–12 (facility's CMS-regulated status and contract with Beaver Valley Hospital), ¶ 50(d) (alleging failure to comply with federal nursing-home regulations) and ¶ 5 (jurisdiction under FNHRA).

[11] *See* Compl. ¶ 12 (facility under contract to manage and operate HHC).

[12] *See* Compl. ¶ 39 ("Defendants engaged in questionable related party transactions, diverting funds away from resident care and contributing to the facility's chronic understaffing and inadequate resources.").

[13] *See* Compl. ¶ 38 ("Defendants failed to invest adequately in staff training, resulting in poorly trained staff who were unable to provide appropriate catheter care and recognize the signs and symptoms of urinary tract infections").

As his condition worsened, no staff member was assigned to update Mr. Richards or his family about his declining health.[15] Nor was there sufficient staff time to initiate a care plan meeting, communicate medical changes, or revise his nutritional orders.[16] Nursing staff lacked the capacity to monitor his steadily decreasing caloric intake over time.[17] By the time a nurse practitioner finally identified the severity of his malnutrition, dehydration, and weight loss, his condition had become irreversible.[18] He was transferred to a hospital in critical condition, where he died shortly thereafter.

This outcome was neither unforeseeable nor the result of isolated negligence. It was the predictable result of deliberate decisions by Beaver City's Hospital Board to divert federal funds into overhead and unrelated administrative costs, despite its fiduciary responsibility to ensure safe, adequate staffing.[19] The Beaver Defendants, through the Hospital Board, created the operational environment that denied Mr. Richards the rights guaranteed under the Federal Nursing Home Reform Act, including the right to adequate staffing, to individualized quality care and to

---

[14] *Id.*

[15] *See* Compl. ¶ 50(f) ("Failure to Provide Adequate Services," including failure to communicate essential information about care changes to residents or their families).

[16] *See* Compl. ¶ 50(a) (alleging "Failure to Inform Mr. Richards of Care Changes") and ¶ 50(e) ("Failure to Develop and Review a Plan of Care").

[17] *See* Compl. ¶ 38 (poor staff training and inadequate resources) and ¶ 50(f) ("Failure to Provide Adequate Services," which encompasses failure to monitor nutrition).

[18] *See* Compl. ¶ 37 (alleging that, as a direct result of defendants' actions, Mr. Richards "suffered unnecessary pain, sepsis, and death," from which the Court can reasonably infer late recognition of his critical condition).

[19] *See* Compl. ¶ 39 (related-party transactions "diverting funds away from resident care"); ¶ 38 (failure to invest in staff training);¶ 16 (alleging defendants "improperly diverted funds away from patient care and into unrelated business transactions;" as these were Medicare funds entrusted to the Beaver Defendants under the UPL program, only the BVH board could have decided how the funds were to be directed).

meaningful participation in decisions affecting his health.[20]

As in *Tester v. Village at Hamilton Point*, where the plaintiff alleged a municipal hospital district retained ownership of the nursing home facility and allowed a third-party operator to administer deficient care, Plaintiffs here assert that Beaver City and Beaver Valley Hospital retained operational authority through licensure, oversight responsibility, and financial structuring, even if day-to-day tasks were contracted out. The court in *Tester* confirmed that such allegations, particularly those tied to resource allocation and policy-level failures, are sufficient to plead a municipal custom or policy. *See Tester*, No. 1:23-cv-01234, slip op. at 5–6. Here, Plaintiffs meet this standard by identifying Beaver City and its Hospital Board's ongoing failure to address staffing shortages and resident care deficits at Holladay Health Care, despite known and predictable risks.

### C.  Plaintiffs Plausibly Allege Deliberate Indifference and Causation.

The Complaint pleads deliberate indifference by alleging that Beaver City and Beaver Valley Hospital were aware, or should have been aware, of the risks associated with their contracting practices and oversight failures, including the chronic inability of Holladay Health Care to meet minimum staffing, monitoring, and intervention standards. Mr. Richards' care trajectory, including documented signs of distress, confusion, hypotension, and eventual septic shock, illustrates how the failure to intervene or ensure adequate conditions resulted in his preventable death. It is from these factual allegations that a plausible inference of deliberate indifference can be drawn.

---

[20] *See* Compl. ¶ 37 (describing his death from septic shock and complications and linking the Beaver Defendants' systemic failures to Mr. Richards' death); ¶ 39 (diverting funds "contributing to the facility's chronic understaffing and inadequate resources"); ¶ 50(h) ("Failure to Provide Sufficient Qualified Staff").

Plaintiffs allege that the Board's decisions were not the result of administrative error or isolated negligence. Rather, they constituted a deliberate and systemic diversion of federal UPL funds away from direct patient care and into administrative overhead, home office fees, and related-party transactions. Despite receiving millions in supplemental Medicaid payments specifically intended to enhance resident care, the Board froze clinical staffing budgets, disregarded administrator warnings, and enforced dangerously low staffing ratios—well below the minimum safety thresholds identified by CMS and established in the medical literature.

Likewise, in *Tester*, the court found it sufficient to plead that the municipality failed to act in the face of recurring evidence of dangerous care conditions. Plaintiffs' allegations regarding Beaver's ongoing ratification of Olympus's cost-focused care model, and its failure to correct chronic deficiencies that foreseeably placed residents at risk, fully satisfy this standard.

**D.  Delegation to Olympus and Ensign Does Not Preclude Liability.**

Defendants attempt to insulate themselves by pointing to third-party operators such as Olympus, but as *Whitson v. Sedgwick County*, 106 F.4th 1063 (10th Cir. 2024), and *Simmons v. Uintah Health Care Special District*, 506 F.3d 1281 (10th Cir. 2007), make clear, final policymaker liability attaches when a municipal policymaking body takes actions that fall within its policymaking authority—even if those actions contradict written policy or are delegated for day-to-day implementation.

In this case, the Beaver City Hospital Board, acting as the final policymaker for Beaver Valley Hospital, retained ultimate authority over institutional decisions concerning how UPL Medicaid funds were allocated and which private entities were contracted to operate the City's network of more than 50 nursing homes across the state. Plaintiffs intend to show the Board

adopted policies and financial arrangements with cost-driven facility operators were understood, if not designed, to systematically underfund direct care services. These decisions did not micromanage staffing schedules, but they created operational conditions where chronic understaffing and substandard care were not merely foreseeable—they were the inevitable result.

While Olympus Health, Inc. operated Holladay Healthcare on a daily basis, Beaver City and Beaver Valley Hospital retained the license, received public reimbursement, and maintained ultimate legal responsibility for regulatory compliance. As *Brown* and *Tester* both recognize, municipal entities cannot insulate themselves from § 1983 liability merely by contracting out services. They remain liable where, as here, they fail to supervise or knowingly allow systemic deficiencies to persist. Under *Monell* and controlling precedent, these high-level policy choices are sufficient to support municipal liability at the pleading stage.

Moreover, the allegations in the complaint do not rest on a theory of vicarious liability. Rather, they describe how the municipal defendants implemented and sustained policies and practices, including approval of resource models and ongoing failure to remediate known harms, that amount to actionable *Monell* violations. The Beaver Defendants retained statutory, regulatory, and financial involvement in Holladay Healthcare Center, yet failed to monitor care quality or enforce remedial measures after signs of serious harm. As the Tenth Circuit has explained:

> [M]unicipalities are rightly held liable for those actions taken by employees in conformance with official policy, this is hardly the only basis available for assigning municipal liability. Municipalities are equally answerable for actions undertaken by their final policymakers, whether or not those actions conform to their own preexisting rules. Were the law otherwise, a municipality's leaders would have the very strange incentive to flout their own policies. Or perhaps even enact policies with the deliberate purpose of disregarding them. While the law is often subtle and sometimes complex, it is rarely so unreasonable.

*Simmons v. Uintah Health Care Special Dist.*, 506 F.3d 1281, 1283 (10th Cir. 2007).

**E.  If Necessary, Leave to Amend Should Be Granted.**

Finally, even if the Court were to find any aspect of the Complaint lacking in specificity, dismissal with prejudice would be improper. Plaintiffs should be afforded the opportunity to amend Monell allegations where operational structures and policymaking chains are not fully discoverable pre-suit. *Brown*, 96 F.4th at 1155. Here, Plaintiffs allege plausible facts based on available information, and any refinement—such as additional detail on the licensing agreement or UPL financial flows—can be supplied through discovery or amendment if the Court deems it necessary.

## <u>CONCLUSION</u>

For the foregoing reasons, Plaintiffs have adequately stated claims for relief under 42 U.S.C. § 1983 based on violations of clearly established rights under the Federal Nursing Home Reform Act, as recognized in *Talevski*. The Complaint plausibly alleges that Beaver City and Beaver Valley Hospital, through their Hospital Board acting as a final policymaker, implemented and maintained policies that resulted in the denial of essential care and the deprivation of Mr. Richards' federally protected rights. These allegations are sufficient to survive a Rule 12(b)(6) motion under *Monell* and controlling Tenth Circuit precedent. Accordingly, Plaintiffs respectfully request that the Court deny the Beaver Defendants' Motion to Dismiss.

DATED this 5th day of August, 2025.

EISENBERG LOWRANCE
LUNDELL LOFGREN

/s/ *Ryan M. Springer*
*Attorneys for Plaintiffs*

## <u>CERTIFICATE OF SERVICE</u>

I HEREBY CERTIFY that on this 5th day of August, 2025, a true and correct copy of the

foregoing **PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANT MARY**

**JEAN WALKER'S MOTION TO DISMISS** was served, via the Court's e-filing system, upon

the following:

Blaine J. Benard
Kody L. Condos
Clayton J. Hadlock
Holland & Hart LLP
222 South Main Street, Suite 2200
Salt Lake City, UT 84101-2194
bjbenard@hollandandhart.com
klcondos@hollandandhart.com
cjhadlock@hollandandhart.com
*Attorneys for Defendants Beaver City and Beaver Valley Hospital*

Jaryl L. Rencher
Steven A. Fredley
Rencher Anjewierden
460 South 400 East
Salt Lake City, UT 84111
rencher@lawfirmra.com
steve@lawfirmra.com
*Attorneys for Defendant Mary Jean Walker*


/s/ *Stephani Dalby*